THE STATE, DEFENDANT IN ERROR, v. JUSTIN W. DEDGE, PLAINTIFF IN ERROR.

Submitted November 7, 1924—Decided January 30, 1925.

1. Where no challenge to the array was presented in writing, and passed upon by the trial judge, and the defendant went to trial voluntarily, the defendant cannot, on writ of error, take advantage of the failure to observe the statutory directions in summoning a foreign jury.
2. Viewed in the light of the organization and history of our judicial system, there is nothing properly subject to criticism in the statutory direction that the *venire facias* for a foreign jury shall be returnable to the Circuit Court, even though the issue be triable in the Court of Oyer and Terminer, or in the Court of General Quarter Sessions or in the Court of Common Pleas.
3. In a libel case, the function of *innuendo* or *colloquium* is to explain what is not made clear, but its office is limited strictly to the explanation of what has gone before. It cannot add to or change or explain the previous statements, which must be sufficient in themselves as to the facts set out in the libelous publication without drawing anything from the *innuendo*.

On error to the Supreme Court, whose opinion is reported in 100 *N. J. L.* 70.

For the plaintiff in error, *Andrew Van Blarcom*.

For the defendant in error, *Wilfred H. Jayne*.

The opinion of the court was delivered by

KALISCH, J. The plaintiff in error was convicted in the Morris County Oyer and Terminer on an indictment charging him with a malicious publication of a libel of and concerning ex-Attorney-General McCran, in his official conduct as such attorney-general, and on said conviction was sentenced to imprisonment in the state prison for a term not more than two years and no less than one year. On appeal to the Supreme Court the conviction and judgment were affirmed.

The libel was in the form of a letter written by the plaintiff in error to "The Jerseyman," a newspaper published and circulated in Morris county, and which written communication purported to be a review and criticism of the official conduct of those entrusted with administering the law in Morris county, but, apparently, was an especial attack upon the conduct of the attorney-general in presenting the evidence before the grand jury, and in the trial of the case against Frank Jancarek, who was indicted for the murder of Janet Lawrence, despite the fact that there was a well-founded basis that one Francis Kluxen committed the deed. On the trial, which was conducted by the attorney-general for the prosecution, Jancarek was acquitted. Public opinion was running against Francis Kluxen, as the murderer, and he was indicted for the homicide and tried by a foreign jury, and was acquitted.

In this latter case ex-Prosecutor Harrison, of Essex county, prosecuted for the state.

The libelous article was written some time after the events alluded to. The appeal to this court is based upon thirty-one assignments of errors and thirty-five specifications of causes for reversal.

The review of this case is before us on a strict writ of error and under the one hundred and thirty-sixth section of the Criminal Procedure act.

The assignments and specifications are argued in the brief of counsel of plaintiff in error under ten points. The last point may be considered by us, first, for it attacks the validity of the trial for the following reasons:

"1. Because the plaintiff in error was illegally tried before a foreign jury, in that the statute provides that the foreign jury shall be returned to the Circuit Court where the issue is triable, and this cause was not triable in a Circuit Court, but before the Morris Oyer and Terminer.

"2. Because the plaintiff in error was illegally tried before a foreign jury.

"3. Because the plaintiff in error was denied the right of trial by jury.

"4. Because the plaintiff in error was the defendant in a cause which was not triable in a Circuit Court, and, therefore, the provisions of the statute concerning foreign juries did not apply to him."

It is conceded that the return of the writ of *venire facias* was to the Morris County Oyer and Terminer, and because of that fact counsel on behalf of the plaintiff in error, before the jury was called, made this statement to the court: "We would like to put in a challenge to the array, your honor, on the ground that under the foreign jury statute, return should be made to the Circuit Court. I have not seen the return; have you the return of the jury? The return is in the Morris County Oyer and Terminer. The statute seems to say that the return should be made to the Circuit Court. That is under section 79." This appears to have been the case. No challenge to the array, in writing, seems to have been presented. 1 *Chit. Crim. L.* 445, says, "a challenge to the array must be made in writing." This is the recognized practice in this state. *Smith* v. *Smith,* 52 *N. J. L.* 207, 208; *Gardner* v. *State,* 55 *Id.* 17; *State* v. *Barker,* 68 *Id.* 19. It further appears that counsel on behalf of the plaintiff in error, in a colloquy with the court, finally said, "I would like to withdraw that challenge to the array, because I do not want to run the risk of postponing the trial," and that concluded the matter so far as an offer to challenge the array was concerned.

Thus, it is plain that counsel, without any further objection, consented to go to trial with the panel of jurors as returned. That the Court of Oyer and Terminer, in which the plaintiff in error was tried and convicted, had jurisdiction of the offense and of the accused cannot be successfully controverted. The contention that because the return was faulty, in that the *venire facias* was made returnable to the Court of Oyer and Terminer instead of to the Circuit Court, is without merit.

The plaintiff in error waived the informality in the *venire* and went to trial, consenting to be tried by a jury selected from the panel returned. No constitutional right of the ac-

cused was thereby violated. He had a trial by a jury consisting of twelve impartial jurors. In order to have successfully taken advantage of the informality in the return of the *venire,* it became essential to interpose a challenge, in writing, to the array, and this was not only not done but the proposal to make a challenge to the array was withdrawn.

Were it not for the fact that the Supreme Court, in dealing with this subject, upheld the legal propriety of the return of the *venire* to the Court of Oyer and Terminer, no further comment would have been necessary.

Answering the contention of counsel of plaintiff in error, in the Supreme Court, that the writ of *venire* was only properly returnable to the Circuit Court, the learned writer of the opinion said: "While it is true that section 79 of the Criminal Procedure act, relating to the trial of criminal cases by foreign juries, provides that the *venire* 'shall be returnable to the Circuit Court in which the issue is triable,' the word 'Circuit' is, obviously, a mistake or misprint. The record shows the order for a foreign jury was made by the Supreme Court for the trial in the Morris County Oyer and Terminer. Record, page 17. The jury to have been returned by the sheriff to the court. Record, page 19. A statute should not be given an unreasonable, ridiculous or absurd construction," &c.

The Supreme Court fell into error, and, rather, naturally so, in view of the fact that in the order, for summoning the foreign jury, obtained in a branch of the Supreme Court, it was inadvertently directed that a *venire* issue returnable to the Court of Oyer and Terminer, which direction was, of course, a violent departure from the settled law and practice of this state relating to writs of *venire* for the summoning of juries in civil and criminal cases, as will be presently demonstrated.

But before taking up the task, it is appropriate to mention in this connection that, while it may be that the failure to observe the statutory direction in summoning the foreign jury was a valid ground of challenge to the array, nevertheless, since it appears that no such challenge was presented in

writing and passed upon by the trial judge, and that the plaintiff in error voluntarily went to trial by a jury of twelve impartial jurors selected from the foreign jury panel, as summoned, his constitutional right to a trial by an impartial jury was not violated. *Brown* v. *State,* 62 *N. J. L.* 666.

Returning from this digression, we will now take up for consideration the criticism made by the Supreme Court to the effect that the word "circuit" in the phrase "shall be returnable to the Circuit Court in which the issue is triable," contained in section 79 of the Criminal Procedure act, "is obviously a mistake or misprint." It is neither the one nor the other. This statutory direction has been in existence for more than a century.

All writs for the summoning of juries, whether the general panel or struck jury or for a foreign jury issued out of the Supreme Court, and were returnable to the Circuit in which the issue was to be tried. *Pat. L., p.* 137, § 6; *p.* 259, § 1; *Rev.* 1821, *p.* 310, § 1.

The statute of 1799, after providing that the process for convening a jury to try an issue in the Circuit Court, shall be a *venire facias* issuing out of the Supreme Court, further provides by section 11 that the sheriff or other officer of the county in which the said Circuit Court is held, shall make return to the said court of all writs and juries with the panels and other matters relative to the same, legally arrayed and executed. *Pat. L., p.* 394, §§ 9, 11; *Rev.* 1821, *pp.* 454, 455.

These provisions have remained unaltered in substance up to the present time. See *Rev.* 1846, *p.* 187, §§ 9, 11; *p.* 97, § 33, which latter section provides that the issuing, serving and returning of writs of *venire facias* shall remain, as by law directed at the time of the passing of the act. See, also, *Nix. Dig.,* 1868, *tit. "Juries"* 452, § 33.

In 1877 the statutes of the State of New Jersey were revised by Mercer Beasley, the then distinguished Chief Justice; David A. Depue, an associate justice, and who, near the close of his distinguished career, became Chief Justice, and Cortlandt Parker, a distinguished lawyer of this state. These eminent jurists, equipped with a profound knowledge

of the common and statute laws, revised the act concerning juries, and under the caption of "Foreign Jury" (*Rev.* 1877, *p.* 530), gave form to and adopted in substance the prior legislation on the subject. For the purpose of clarity the provisions relating to a foreign jury are here cited in full.

"Section 36. The Supreme Court may, in its discretion, order trials by foreign juries in all cases, civil or criminal, which may have been commenced in that court, or may be removed to that court from any other court.

"Section 37. The Supreme Court, whenever in their opinion a fair and impartial trial cannot be had before a jury of the proper county, may upon motion in behalf of the state, or on the part of any defendant or prisoner, order any indictment found at any Court of Oyer and Terminer and General Jail Delivery, or at any Court of General Quarter Sessions of the Peace, to be tried by a foreign jury in the court and county in which such indictment was found.

"Section 38. Whenever a foreign jury shall be ordered, the order for a jury shall specify the number of jurors to be returned, and the *venire* shall be directed to the sheriff of the county from which such jury shall be taken, and shall be returnable to the Circuit Court in which the issue is triable; the jurors shall be selected in the same manner as the general panel of jurors is selected, and shall be such as are competent jurors for the county from which they are taken; and the expense of summoning and returning such jurors, and of their attendance at the court, shall be paid by the county within which such court shall be held."

These three sections under the act concerning juries and under the caption of "Foreign Jury" (3 *Comp. Stat., p.* 2977), unaltered, in substance, are sections 36, 37 and 38. But under the act concerning criminal procedure and under the title of "Foreign and Struck Juries" (2 *Comp. Stat., pp.* 1845, 1849), the substance of the three sections is embodied in sections 78 and 79.

Viewed in the light of the organization and history of our judicial system, there is nothing properly subject to criticism in the statutory direction that the *venire facias* shall be re-

turnable to the Circuit Court in which the issue is triable, even though the issue be actually triable in the Court of Oyer and Terminer, or in the Court of General Quarter Sessions of the Peace or in the Court of Common Pleas. The Supreme Court is a tribunal of original and appellate jurisdiction in civil and criminal cases. Each justice is assigned to preside over a particular judicial circuit comprising one or more counties in the state. Each county has its Supreme Court circuit, Circuit Court, Common Pleas Court, Oyer and Terminer, &c., of which the Supreme Court justice is the presiding judge. He is authorized to sit in his circuit, and in that capacity is authorized to try a criminal cause, sent to his circuit by the Supreme Court for trial, or by virtue of his office he may sit in the Court of Oyer and Terminer, or in the Court of General Quarter Sessions of the Peace. All civil cases having their origin in the Supreme Court or in the Circuit Court are triable before him, in the former as a justice of the Supreme Court holding the circuit, and in the latter as a Circuit Court judge, by virtue of his office.

As the writ of *venire facias* issues out of the Supreme Court, for the summoning of jurors for the trial of civil and criminal causes, and as the Supreme Court has its Circuit Court in each county as a part of its original composition, it was strictly logical to make the Circuit Court the repository of return of the writ of *venire facias* for jurors qualified to sit in civil and criminal cases triable in any of the courts of the county in which such issues were triable. In plain terms the *venire facias* shall be returnable to the Circuit Court for the trial of issues properly triable in any of the county courts, not particularly in the Supreme Court circuit or the Circuit Court as such, but also in the Court of Common Pleas, Court of Oyer and Terminer and Court of General Quarter Sessions of the Peace. The foreign jury section is in complete harmony with the settled law and practice.

The return of the *venire facias* in the present case was faulty, but, as has already been pointed out, the defect in the process was practically waived by counsel of the plaintiff in error at the trial.

We will now take up for consideration the point made that, when the state rested its main case, there was no proof of a *colloquium* that Mr. McCran was meant as one of the "powers to be," &c. A motion was directed for a verdict of acquittal by counsel of defendant on that ground. The learned judge denied the motion, which was right. There was proof that the defendant wrote the article; that Mr. McCran was the attorney-general of the State of New Jersey, and that in the article in question he referred to the attorney-general.

The assertion that the *colloquium* and *innuendos* relating to the "powers to be" were not proven, is not borne out by the facts of the case. It may be well to state in this connection that the function of an *innuendo or colloquium* is to explain what is not made clear, but its office is limited strictly to the explanation of what has gone before. It cannot add to or change or explain the previous statements, which must be sufficient in themselves as to the facts set out in the libelous publication without drawing anything from the *innuendo*. The *innuendo* points out the meaning only and where an *innuendo* points out a wrong meaning it may be rejected as surplusage. If on the trial the meaning pointed out by the *innuendo* does not appear, why, of course, the *innuendo* will be rejected. It appears, however, in this case, that the phrase "powers to be" had reference to the attorney-general. as may be gathered from the fact that the attorney-general is mentioned by name in various parts of the libel, and was the person who prosecuted Jancarek for murder and was connected in presenting the evidence to the grand jury.

This disposes of the numerous assignments of errors based on this phase of the case. It follows from what has been said that the refusal of the judge to instruct the jury to disregard all parts of the alleged libel, except those in which the attorney-general was mentioned by name, and that the state be limited to that part of the libel which named the attorney-general, was warranted.

The learned judge, in view of the testimony in the case, very properly submitted to the jury, for its consideration and guidance, in passing upon the question whether the news-

paper article was libelous or not, and reflected directly or indirectly upon the character and official conduct of the attorney-general, a reading of the entire article, which course seems to us was, not only free from any impropriety in law, but was, singularly, to the advantage of the plaintiff in error, who was entitled to have the entire article considered by the jury in passing upon the question whether the matter contained in the article was privileged, or whether the statements reflecting upon the official conduct of the attorney-general were true and published with good motives and for justifiable ends.

Furthermore, it appears from a fair reading of the libelous article that its general scope was to attack the administration of the law, and especially those who are and were intrusted with enforcing the law in Morris county, in the trial of the two homicide cases of Kluxen and Jancarek. Everything that was said in the article was relative, since the facts stated therein were intimately connected with each other.

Under point two in the brief it is argued, on behalf of plaintiff in error, that the court erred in refusing to give this instruction: "If you find that the evidence is susceptible of two constructions, one of guilt and the other of innocence, you must adopt the construction favorable to the defendant and acquit him." We think this request was properly refused. It is, however, a correct statement of an abstract proposition of law. As it stood, it was unrelated to any particular part of the evidence in the case. It was too indefinite in order for the plaintiff in error to have had the benefit of it. It was necessary to connect it up with that evidence in the case of facts which might bear a double construction. It is apparent that the matter of the article was libelous. The only relevancy that the request could have had would have been in connection with those matters which were in evidence and bore a construction consistent with innocence as well as with guilt. In this respect the court fully charged the substance of the request.

Under points three and four of the brief of plaintiff in error it is argued that the court erred in permitting the state

to recall the attorney-general on rebuttal, and permitting the latter to testify as to the details in the preparation of and conduct by him of the Jancarek case. The insistence is that this kind of testimony was improper on rebuttal, and should have been introduced on the state's main case. But this appears to be a misconception of the legal rule in libel cases. While it is true that the defendant did not attempt to justify the statements made by him in the libelous article he did seek to avoid the consequences of his act, by attempting to show that what he said was privileged, and that the occasion for the publication of the article came within the legal rule of exonerating him from criminal responsibility.

In *Fahr.* v. *Hayes,* 50 *N. J. L.* 275, it was held: "1. In order to bring a criminatory statement within the class of communications having a qualified privilege, the burden is on the defendant, in an action for libel or slander, to show—first, that the occasion was privileged, and second, that the statement was made under an honest belief in its truth. 3. When the qualified privilege of a criminatory statement has been shown, the burden then rests upon the plaintiff to prove express malice. Express malice here means some motive actuating the defendant different from that which *prima facie* rendered the statement privileged, and being in itself contrary to good morals."

It should be mentioned in this connection that the constitutional provision in reference to libel is not the only defense which the defendant may set up when charged either civilly or criminally with libel. The constitutional provision added a defense to an indictment or action for libel which defense did not exist at common law, that is, that the truth may be given in evidence, and that the matter was published with good motives and for justifiable ends. For at common law the legal rule was, the greater the truth the greater the libel. But there was a defense well recognized in the law which could be set up as a valid excuse that the article written and published was privileged at the time it was published.

It was said in *Benton* v. *State,* by this court, 59 *N. J. L.* 551 (on *p.* 560) : "While the acts of a public officer may be

fully criticised, and the act itself may be a target for the shafts of sarcasm and ridicule, and the occasion will excuse everything in the attack except actual malice, yet the occasion will not of itself permit the character and motive of the officer to be assailed, unless the assailant shall show the truth of what he uttered. 13 *Am. & Eng. Encycl. L.* 419."

Dr. Odgers, in his valuable work on *Lib. & S.* 197, in treating on the subject of qualified privilege, says, that privilege attaching to fair and accurate reports may be rebutted by proof of actual malice. He cites with approval the language of Lord Justice Brett, in *Millisich* v. *Lloyds,* 46 *L. J. C. P.* 407, where the latter says: "Hence, in these cases there may be two distinct questions for the jury—(1) Is the report fair and accurate? If so, it is *prima facie* privileged; if not verdict for the plaintiff. (2) Was the report, though fair and accurate, published maliciously? Was it published solely to afford information to the public and for the benefit of society, without any reference to the individuals concerned, or was it published with the malicious intention of injuring the reputation of the plaintiff. The second question, of course, only arises when the first has been already answered in the affirmative."

It was therefore proper for the state to show that the statements made in the article were false, and to show, by conversations and conduct of the attorney-general, what he did in connection with the two homicide cases in question, and, furthermore, to show the falsity of the accusations made in order to establish express malice, and in that aspect the testimony of Attorney-General McCran, on rebuttal, was properly received.

Under point five of the brief, counsel of plaintiff in error argues an exception taken to the charge made by the trial judge wherein he refers to the existence of rule of law that a civil action for libel will be postponed until an indictment for the same cause is disposed of. This was unnecessary comment, but we can perceive no harm in the statement. So, also, we find no merit in the exception to that part of the court's charge where he said: "So, that as a matter of law

and custom, the state is tender of the reputation of a public officer, and the rules, with respect to slander and libel, are drawn with reasonable jealousy for the good name of an officer actually in the execution of his office," &c.  On behalf of the plaintiff in error it is claimed that the court, in effect, charged the jury that it was a greater offense to libel a public official than a private individual.  We think this is a strained construction put upon the remarks made by the court.  At any rate, what the court said was by way of mere comment, and it has not been made plain to us that it was harmful to the plaintiff in error.

Under point seven, of the brief of counsel of plaintiff in error, it is urged, as a cause for reversal of the judgment below, that the trial judge excluded from the jury's consideration the defense of privileged communication, as presented by the evidence, and limited the consideration of the jury to a single defense, namely, the truth of the publication, and whether it was published with good motives and for justifiable ends, and as the only defense available to the defendant, and which defense, if established, would entitle him to an acquittal.

This contention overlooks the important and essential facts that nowhere in the evidence does it appear that there was any proper occasion for the publication of the article, and that there was an implied concession by the defendant himself, that he was unable to prove the truth of his statements in said publication, and his admission that he drew inferences, as to their truth from rumors communicated to him by others. In such circumstances the trial judge was warranted in refusing to charge the defendant's request relating to the legal rule governing privileged communications, and we find no error in limiting the defendant's defense to the one guaranteed him by the constitution, namely, proof of truth of the publication, and that it was published with good motives and for justifiable ends.

It is next argued that there was error in the admission of a question put by the counsel of the state on direct examination, on the rebuttal, to a Mr. Buchanan, who was a member

of the grand jury which indicted Francis Kluxen, as to whether the statements made in the published article, which related to Mr. McCran's conduct before the grand jury, when presenting the evidence against Kluxen, were true or false. The ground of objection was that it was calling for the opinion of the witness. But this was, obviously, not so. The question related to facts, of which the witness was competent to speak, namely, what were Mr. McCran's acts in presenting the evidence.

Lastly, it is contended that the court erroneously overruled a question put to defendant upon his direct examination, which question was: "Will you state whether or not you intended to charge that the attorney-general willfully or knowingly came or was brought into the case for the purpose of prosecuting Jancarek, knowing him to be innocent, and without the intention of shielding the Kluxen boy?" Under certain conditions and circumstances such an inquiry might have been properly admissible, were it not for the fact that the language used by the plaintiff in error regarding the conduct of Mr. McCran was so clear and explicit as to leave no room for doubt what the plaintiff in error meant or intended when he used such language concerning the actions of Mr. McCran in his connection with the Jancarek and Kluxen cases, nor for any construction favorable to the plaintiff in error that he intended anything else than to maliciously malign and degrade ex-Attorney-General McCran, who, conscientiously and fearlessly, discharged his duty in the matter. We find no error in overruling the question.

The judgment of the Supreme Court, affirming the judgment of the Morris County Court of Oyer and Terminer, is affirmed, for the reasons given in this opinion.

*For affirmance*—THE CHANCELLOR, TRENCHARD, KALISCH, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, CLARK, MCGLENNON, JJ. 9.

*For reversal*—None.